OPINION
Appellant, Scott Burrows, brings this appeal from a judgment of the Trumbull County Court of Common Pleas, finding him guilty of aggravated murder, kidnapping, aggravated burglary, and aggravated robbery of Charles A. and Dorothy M. London ("Mr. and Mrs. London) following a jury trial. For the following reasons we affirm.
The following testimony was admitted. Mr. London, seventy-five years old, and Mrs. London, seventy-four years old, resided on Broadway Avenue in Hubbard Township, Trumbull County. Appellant lived next door to the Londons with his mother and stepfather.
At approximately 4:00 p.m., on December 16, 1999, Paul London ("Paul") attempted to contact his parents by telephone. Because there was no response to his phone calls, Paul contacted his sister, Carol London Nuth ("Carol"). After Carol unsuccessfully attempted to reach her parents by telephone, she contacted Beverly Donnan, ("Ms. Donnan"), a neighbor of the Londons and asked her to check up on her parents.
When Ms. Donnan arrived at the Londons' residence, she discovered Mrs. London lying on the bathroom floor. In response to the situation, Ms. Donnan called 911. She also informed Carol that her mother had been injured, that she could not locate Mr. London, and that two vehicles were missing from the residence.
Soon thereafter, officers from the Hubbard Township Police Department arrived at the Londons' residence. Law enforcement later learned that a number of firearms, including a bow and arrow, were missing from the residence, along with two vehicles, to wit: a 1996 Ford Crown Victoria and a 1984 Pontiac Parisienne.
At approximately 4 a.m., on December 16, 1999, appellant checked into the Tallyho Motel in Youngstown at which time he was observed driving the Crown Victoria belonging to the Londons. According to the assistant manager of the motel, appellant checked out at 11:37 a.m.
Later that same day, appellant attempted to give his friend, Jacquelyn Connors ("Ms. Connors") the Crown Victoria, which he claimed to have purchased at J.D. Byrider. Ms. Connors declined appellant's offer to take the vehicle. In an attempt to dispose of the Crown Victoria, appellant then visited another friend by the name of Diamond Anthony Carpec and asked him if he knew of any "chop shops."
At around 10 or 11 p.m. that evening, appellant decided to travel towards Cleveland in an attempt to get rid of the Crown Victoria. While en route to Cleveland, appellant stopped at a rest area in Ashtabula because he started to feel drowsy while he was driving.
In the early morning hours of December 17, 1999, Trooper Christopher G. Dunn ("Trooper Dunn") of the Ohio State Highway Patrol, Ashtabula Post, observed the Crown Victoria in a stationary position at the rest area. Ultimately, appellant was arrested, and numerous firearms, including a bow and arrow, pellet gun, and pellets, were found in the Crown Victoria.
On December 16, 1999, Mark Worley ("Worley"), appellant's friend, was seen driving the Pontiac Parisienne belonging to the Londons. On December 19, 1999, the Mill Creek Police Department recovered the vehicle. Detective Donald M. Begeot ("Detective Begeot") of the Hubbard Township Police Department discovered copious amounts of blood in the trunk of the vehicle. Near the vicinity of the vehicle, a pair of white gloves, a credit car belonging to Mr. London, a serrated knife and a BB gun were found. Subsequently, Mark Worley was also arrested in connection to the Londons' murder.
On December 22, 1999, Mr. London's body was recovered from the Mahoning River near the West Avenue Bridge. Law enforcement discovered drag marks and blood near the bridge, which was later shown to belong to Mr. London.
Subsequently, on December 28, 1999, the Trumbull County Grand Jury indicted appellant. That indictment included one count of aggravated murder in the death of Mr. London, in violation of R.C. 2903.01(B) with three specifications of aggravating circumstances, to wit: R.C.2929.04(A)(5), (A)(7); one count of aggravated murder in the death of Mrs. London, in violation of R.C. 2903.01(B) with four aggravating circumstances, to wit: R.C. 2929.04(A)(3), (A)(5), (A)(7); one count of kidnapping of Mr. London in violation of R.C. 2905.01(A)(2), (3); one count of aggravated robbery of Mr. London in violation of R.C.2911.01(A)(1), (3); one count of kidnapping of Mrs. London in violation of R.C. 2905.01(A)(2), (3); and one count of aggravated burglary of the Londons' residence in violation of R.C. 2911.11(A)(1), (2).[1]
Appellant subsequently entered a plea of not guilty to all charges. On March 29, 2000, the trial court held a hearing in response to appellant's motions to suppress. In a lengthy judgment entry issued on April 28, 2000, the trial court denied the motions. The matter proceeded to trial by a jury.
On May 31, 2000, the jury returned a guilty verdict on all six counts. Upon completion of the mitigation phase as to the aggravated murder charges, the jury recommended that two sentences of life imprisonment without parole be imposed on appellant.
On June 13, 2000, appellant was sentenced to two consecutive life sentences without parole as to the aggravated murder charges and ten years for each of the remaining four counts to be served consecutively to each other.
Appellant now appeals his conviction, advancing five assignments of error for our review:
 "[1.] The trial court erred by denying the appellant's motion to suppress the fruits of an unconstitutional arrest in violation of the Fourth and Fourteenth Amendments of the United States Constitution and Article I, Sections 14 and 16 of the Constitution of the State of Ohio.
 "[2.] The trial court erred by denying the appellant's motion to suppress identification testimony by Stella Cattoi.
 "[3.] The trial court abused its discretion by denying appellant's motion for a mistrial following the jury's viewing of a videotape of the victims' home.
 "[4.] The trial court abused its discretion by denying the admission of certified copies of Sean Holler's convictions.
 "[5.] The appellant's conviction is against the manifest weight of the evidence."
Because the first and second assignments of error challenge the trial court's denial of appellant's motions to suppress, they will be addressed in a consolidated fashion.
In the first assignment of error, appellant challenges the trial court's denial of his motion to suppress, claiming that Trooper Dunn lacked probable cause to arrest appellant. According to appellant, Trooper Dunn approached the vehicle in which he was sleeping with the express intent of arresting the occupant. The only reason for doing so, appellant claims, was at the request of Hubbard Township Police Department, who stated that the owner of the vehicle was wanted merely for questioning in connection with the murder of Mrs. London.
At a hearing on a motion to suppress, the trial court functions as the trier of fact. As such, the trial court it is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of witnesses. State v. Mills (1992), 62 Ohio St.3d 357, 366;State v. Smith (1991), 61 Ohio St.3d 284, 288; State v. DePew (1988),38 Ohio St.3d 275, 277; State v. Fanning (1982), 1 Ohio St.3d 19, 20.
On review, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v.Retherford (1994), 93 Ohio App.3d 586, 592; State v. Guysinger (1993),86 Ohio App.3d 592, 594; State v. Klein (1991), 73 Ohio App.3d 486, 488. After accepting such factual findings as accurate, the reviewing court must independently determine as a matter of law whether the applicable legal standard has been satisfied. Retherford at 592; Klein at 488.
In resolving this issue, we must separately analyze the conduct of the law enforcement participants during the initial investigatory detention and arrest of appellant.
The following evidence was elicited at the suppression hearing. At approximately 5:50 a.m., on December 17, 1999, Trooper Dunn pulled into a rest area located on State Route 11 in Ashtabula County. Upon arrival, Trooper Dunn noticed four cars in the rest area and ran a "file check" on these vehicles by entering the license plate numbers through the Law Enforcement Automated Data System ("LEADS") "to [determine] if there were any wants or warrants on the owner and/or stolen vehicles." Upon completing the file check, the 1996 Ford Crown Victoria, came back with a Caution Ohio Police ("COP") alert, which was issued by the Hubbard Township Police Department:
 "Q. [on direct examination by the prosecutor] Tell us exactly what a COP alert is and how you use it?
 "A. COP alert, one is not for basis to detain, arrest or stop alone. It's pretty much to it disseminates information for potential hazardous situations pretty much gathered at an instant right off the bat." (Emphasis added.)
 At this point, Trooper Dunn observed that the Crown Victoria was parked in a parking spot with the engine running. The COP alert advised Trooper Dunn that the owner of the vehicle, Mr. London, was wanted for questioning in connection with the death of his wife. Trooper Dunn also learned from his dispatch that the Hubbard Township Police Department wanted him to take the occupant of the vehicle into custody:
 "A. I learned from my dispatch that Hubbard Township Police Department wanted me to take the occupant into custody. I then verified it at the patrol post. `They want me to take him into custody?'
 "They said, `Correct. Take both the vehicle and the occupant into custody for questioning by the Hubbard Township Police Department.'"
Once Trooper Dunn received this information from the COP alert and the police radio dispatch that the Hubbard Township Police Department wanted both the vehicle and the occupant to be taken into custody, he placed his patrol car behind the Crown Victoria "[t]o keep [it] from leaving the rest area." Given that Trooper Dunn was advised to approach the vehicle with caution, he requested assistance.
While waiting for back-up to arrive, Trooper Dunn approached the vehicle and observed the occupant asleep in the driver's seat. Trooper Dunn was advised that the owner of the vehicle was approximately seventy-five years old. However, when he glanced into the vehicle, Trooper Dunn was unable to tell the age of the occupant or whether the individual was a man or a woman.
Once back-up arrived, Trooper Dunn, along with other officers, approached the driver's side of the vehicle with their guns drawn. At that point, Trooper Dunn made the following observation:
 "A. I got a few feet away from the vehicle. I noticed the occupant was laying there. Again, he appeared to be sleeping. I glanced up towards the passenger seat up front and there was a shotgun in plain view. I alerted the other officers to this. I advised him, `He's got a shotgun over here.'"
Trooper Dunn then proceeded to open the driver's side door and command appellant to exit the vehicle and get down on the ground. Before being placed in the patrol car, appellant was handcuffed, and he was read his Miranda rights.
According to Trooper Dunn, appellant was arrested for improper handling of a firearm, a misdemeanor offense:
 "Q. [direct examination by prosecuting attorney] Trooper Dunn, based on your education, training and experience as a trooper for the State Highway Patrol, were there any other reasons for arresting the defendant at that time beyond what Hubbard Township Police Department told you?
 "A. When I approached and found a firearm, the breech or action was closed and there were a couple rounds in the ashtray. So there was a firearms violation there, sir.
"Q. Do you know specifically what firearms violation?
 "A. Improper transportation, improper handling of a firearm."
"* * *
 "Q. Trooper Dunn, one final question. Bottom Line. Why did you arrest the defendant at that time?
 "A. At that point in time it was for the firearms violation when we approached, sir."
 At the outset, we note that a traffic stop, in the traditional sense, did not occur in this case. Instead, appellant was seated in a stationary automobile at a rest area. When an encounter rises to the level of a seizure, the Fourth Amendment is triggered:
 "A seizure occurs `only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave.' United States v. Mendenhall (1980), 446 U.S. 544, 554. Factors suggesting that a seizure has occurred include the presence of multiple police officers, the displaying of a weapon by the police, the use of language suggesting that compliance with police requests is compelled, and the physical touching of the citizen. Id. at 554." Willowick v. Stephenson (July 16, 1999), Lake App. Nos. 98-L-144, 98-L-145, 98-L-146, and 98-L-147, unreported, 1999 Ohio App. LEXIS 3337, at 5; See, also, Terry v. Ohio (1968), 392 U.S. 1, 19; State v. Cominsky (Dec. 14, 2001), Lake App. No. 2001-L-023, 2001 Ohio App. LEXIS 5658, at 5.
The next possible moment when a seizure would have occurred was when appellant was awakened by Trooper Dunn opening the driver's side door and commanding appellant to exit the vehicle. At that point, appellant had to be aware that he was in the presence of several officers who had their guns drawn, compelling him to exit the vehicle.
In order to detain an individual, an officer must have reasonable suspicion based on specific and articulable facts that an individual is or had been engaged in criminal activity. Terry at 21; Delaware v.Prouse (1979), 440 U.S. 648, 663. Upon considering the totality of the circumstance, we determine that the initial detention of appellant was constitutionally sound because the police radio dispatch issued by the Hubbard Township Police Department based on information gather by Detective Begeot provided Trooper Dunn with reasonable suspicion of criminal conduct.
The Supreme Court of Ohio has recently held that a police officer may rely solely on a police radio broadcast for reasonable suspicion to effectuate an investigatory detention:
 "Where an officer making an investigative stop relies solely upon a dispatch, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." (Emphasis added.) Maumee v. Weisner
(1999), 87 Ohio St.3d 295, paragraph one of the syllabus. See, also, State v. Evans (1998), 127 Ohio App.3d 56, 60-62; State v. Hrubik (June 30, 2000), Ashtabula App. No. 99-A-0024, 2000 WL 898820, at 4.
 In the present cause, the police radio dispatch was based upon information obtained by Detective Begeot, an eighteen-year veteran with the Hubbard Township Police Department, who had been investigating the murders of Mr. and Mrs. London on December 16, 1999.[2]
During the course of his investigation, Detective Begeot obtained information that there were two vehicles missing from the Londons' residence, to wit: a 1996 Ford Crown Victoria and a 1984 Pontiac Parisienne, and that Mr. London was, himself, missing as well. With this information, a COP alert and a police radio broadcast were issued:
 "Q. [by prosecuting attorney on direct examination at suppression hearing] And you had two vehicles missing and you had Mrs. London who was murdered and you had things [firearms] taken from their house; is that correct?
"A. [by Detective Begeot] That's correct, sir.
 "Q. And did you feel from everything you knew that there would be more than one person involved in this particular crime?
 "A. Yes. I felt and had learned during the course of my investigation that at least two people, if not more, had to be involved.
 "Q. And would you give the reasons for that to [the court]?
 "A. Normally you don't get the amount of weapons that were indicated missing from the home taken by one person, that amount of weapons, as well as the two vehicles. You know. It would take at least two people, if not more, to drive away the vehicles.
"* * *
 "Q. And you were also, did you have a suspicion where you'd find Mr. London?
 "A. At that time, we assumed that he would — I assumed that he would be with the cars, possibly kidnapped from the home, removed by force. That was indicated by both the children that were there, Carol and her brother Paul, that rarely did they separate. When they went somewhere they would normally go together and that Charles didn't drive that much at night alone. He did not like to drive because of his eyesight.
"* * *
 "Q. So with the information you had, did you enter in any state teletype, NCIC, anything that would communicate to other agencies, police departments, that they should be on the lookout for the vehicles that you've described * * * that were missing?
"A. Yes sir, I did.
"Q. And when was that?
 "A. There were two things done late that evening [December 16, 1999] after we determined the vehicle registrations and VIN numbers and accurate description of the cars, as well as Mr. London, the gentlemen missing from his home.
 "There was a broadcast prepared and put out over the police band radio to be on the lookout for these two vehicles, as well as Mr. London.
 "And in Ohio we also have a program that's referred to as Caution Ohio Police or COPS, c-o-p-s. That information was also put out through L.E.A.D.S., again, containing the information on the two cars and Mr. London missing from his home or the home of a homicide.
"Q. And when was this done?
 "A. This teletype was put out on now Friday, December the 17th at 12:36 a.m. So just into the early morning hours now of Friday.
 "I believe prior to this information going out over the teletype that it was also put out on the police band radio. I am not sure which came first, but I believe that information was put out over the police band radio prior to this being sent out.
"Q. Would you give me that date and time again?
 "A. Yes, sir. Friday, December 17, 1999 at 12:36 a.m."
Based on the fact that Mrs. London had been murdered, that two vehicles, as well as Mr. London, were missing from the residence, that the couple rarely separated from each other, and that Mr. London did not normally drive at night due to his eyesight, Detective Begeot believed Mr. London would be found with the vehicles, possibly kidnapped. In light of the foregoing, the state presented adequate evidence of the facts known to Detective Begeot that precipitated the police radio dispatch to give rise to reasonable suspicion to make an initial investigatory detention by Trooper Dunn.
The second event to be analyzed is the actual arrest of appellant. Probable cause to arrest exists when a reasonable prudent person would believe that the individual to be arrested committed a crime. State v.Timson (1974), 38 Ohio St.2d 122, paragraph one of the syllabus. In the instant matter, Trooper Dunn garnered probable cause to arrest appellant for improper handling of firearms in a motor vehicle, in violation of R.C. 2923.16, when he observed in plain view the shotgun located in the front passenger seat of the Crown Victoria with the action closed.[3]
While such an offense is merely a misdemeanor, Trooper Dunn was permitted to arrest appellant for the firearm violation as the offense was committed in his presence. State v. Henderson (1990), 51 Ohio St.3d 54,56 (holding a police officer may make a warrantless arrest for a misdemeanor if the offense is committed in the officer's presence).
A final matter concerning the arrest is appellant's assertion that Trooper Dunn intended to arrest the occupant of the vehicle prior to learning of the existence of the shotgun.
The following exchange, which took place at the suppression hearing, is relevant to resolving this issue:
 "Q. [by the prosecuting attorney on direct examination] Trooper Dunn, when you approached the car before you saw the firearms, were you going to arrest the person in that vehicle?
"A. Yes, sir, I was.
"Q. Why?
 "A. Hubbard Police Department advised they wanted the subject and the vehicle taken into custody and held for processing.
 "Q. But once you saw the firearms, then you arrested him on that violation?
"A. That's correct, sir."
In light of this, appellant concludes that Trooper Dunn's advanced intent to arrest him based on the Hubbard Police Department broadcast somehow invalidated the arrest and subsequent search of appellant and the vehicle.
As to this point, the Supreme Court of Ohio made the following observation:
 "An arrest made on probable cause does not become unreasonable under the Fourth Amendment to the United States Constitution just because police had the ulterior motive of investigating another crime for which they lacked probable cause." (Emphasis added.) State v. Williams (1997), 79 Ohio St.3d 1, 14. See, also, Dayton v. Erickson (1996), 76 Ohio St.3d 3, 11-12.
Thus, notwithstanding any ulterior motive that Trooper Dunn may have possessed, the arrest was constitutionally permissible because there was probable cause to believe that appellant committed a firearm violation. Accordingly, appellant's first assignment of error is without merit.
We now focus our attention on whether a photo array shown to Stella Cattoi ("Ms. Cattoi") was unduly suggestive. At the outset, we note that this assignment of error could have been rendered moot in light of appellant's trial testimony wherein he admitted to purchasing two hot chocolates at the bowling alley. At most, there was a dispute as to the length of time appellant spent in the bowling alley. Thus, appellant's primary claim of prejudice lies with the time frame. Given the severity of the charges involved in this case, we have chosen to address the issues concerning the photo array.
By way of background, Ms. Cattoi testified at the suppression hearing that she was employed at Bell-Wick Lanes, a bowling alley in Hubbard Township. According to Ms. Cattoi, on December 15, 1999, she sold two hot chocolates to a male wearing a bulky coat, average built, 5'8" 5'10", light brown hair, no glasses and no facial hair. On January 17, 2000, Detective Begeot prepared a photo array, and Ms. Cattoi identified appellant as the individual who had purchased the two hot chocolates at the bowling alley. It is this array upon which appellant focuses in this assignment.
Under these circumstances, "[t]he burden is on the defendant to prove that the procedure employed was unfairly suggestive and that the resulting identification was unreliable based on the totality of the circumstances standard * * *." State v. Johnson (Sept. 24, 1999), Trumbull App. No. 97-T-0227, unreported, 1999 WL 778383, at 3. In determining whether the trial court erred in allowing the identification testimony from the photo array, we must engage in a two-step analysis. First, we must determine whether the identification procedure used was unduly suggestive. Johnson at 2. If the identification procedure was unduly suggestive, then we must proceed to the second step; was the procedure so unduly suggestive as to give rise to a substantial likelihood of misidentification:
 "In the second step of the [Neil v. Biggers (1972), 409 U.S. 188] test, the trial court must consider the `totality of the circumstances' under which the pretrial identification was made in order to determine whether or not the identification is reliable:
 "`[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.'" Id. at 199-200. See, also, State v. Jells (1990), 53 Ohio St.3d 22, 27 * * *." (Parallel citation omitted.) Johnson at 2.
Accordingly, even if a court determines that the identification procedure employed by the police was unduly suggestive, the identification can still be admissible so long as the testimony was reliable, given the totality of the circumstances. Id. at 2-3.
In regards to the first step, appellant complains that Detective Begeot comprised an unduly suggestive photo array because the array contained a picture of three individuals who had facial hair and one individual who had light hair in spite of the fact that Ms. Cattoi described the individual as having no facial hair. From this, appellant concludes that this immediately eliminated four of the six individuals in the photo array, thus leaving Ms. Cattoi with only two choices, one of which was appellant, thereby making the photo array unduly suggestive.
A review of the photo array reveals that one individual had a moustache with a light beard while another individual had a moustache with a light beard and a goatee. A third individual had a shadow beard and moustache, while the fourth individual had a very inconspicuous moustache. Appellant and another individual were depicted in the array as having no facial hair.[4]
Beyond this, however, the six photographs contained in the array all depict white males roughly the same age, with brown to light brown hair, normal complexions, and round faces. Height was not apparent from the photo array.
It is worth mentioning that this court was recently confronted with a similar factual scenario. In Johnson, supra, two eyewitnesses indicated that the defendant had no facial hair. However, in the photo array employed by the police, the defendant was the only individual who was clean shaven while the five remaining men had either a moustache, a goatee, or a shadow moustache. Johnson at 4. Upon consideration, we determined that the photo array was not unduly suggestive for the following reasons:
 "In retrospect, the inclusion of appellant as the only clean shaven suspect was a risky decision. Under other circumstances, such a choice could have fatally tainted the photo lineup. In this case, however, we do not believe that the photo array as assembled was overly suggestive. While it is true that appellant was the only man who was totally clean shaven, this fact alone does not render the array impermissibly suggestive given the other physical similarities of the six men depicted." (Emphasis added.) Id.
In the instant matter, we readily agree with appellant that Detective Begeot compiled a less than perfect photo array. Nevertheless, we conclude that in light of Johnson, the trial court correctly determined that the photo array had not been impermissibly suggestive.
Even if we were to assume, arguendo, that the photo array was unduly suggestive, it does not render Ms. Cattoi's identification constitutionally deficient as the other indicia of reliability are particularity strong in this case.
Appellant suggests that Ms. Cattoi's identification was unreliable for the following reasons: (1) approximately a month had passed before she made the identification;[5] (2) at trial, Ms. Cattoi testified that the individual she identified had light colored hair while at the suppression hearing she stated that the individual had brown hair; and (3) Ms. Cattoi's degree of attention and her view of the individual were limited.
Upon considering the factors set forth in Biggers concerning the reliability of an identification, it is apparent that Ms. Cattoi's identification of appellant was admissible. At the suppression hearing, Ms. Cattoi recalled that the individual in the bowling alley on December 15, 1999 was a male wearing a bulky coat, average built, 5'8" 5'10", light brown hair, no glasses, no facial hair and that the individual's face was red as if he had been outside for a long period of time. According to Ms. Cattoi, the individual approached the snack counter at the bowling alley and ordered two hot chocolates. She was able to observe the individual for approximately five minutes.
Under these circumstances, Ms. Cattoi made her selection quickly and, apparently, she had no difficulty selecting the photo. Further, Ms. Cattoi's level of certainty was high. Specifically, she testified that Detective Begeot asked her to determine on a scale of one to ten, one being the least and ten being the most, how sure she was. Ms. Cattoi indicated that the identification was an eight. In fact, on the photo array, she commented that she was "pretty sure this one [appellant] bought the 2 hot chocolates on 12/15/99[.]"
Detective Begeot did testify that Ms. Cattoi described the individual as having "brownish hair." However, Ms. Cattoi was able to subsequently identify appellant as the individual who purchased the hot chocolates both at the suppression hearing and at trial. Further, Detective Begeot testified that during the identification process, he never suggested to Ms. Cattoi that the individual she had seen in the bowling alley was depicted in the photo array. In short, there was little reason for the trial court to believe that Ms. Cattoi's identification was suspect.
Accordingly, the trial court properly overruled the motion to suppress the identification, and properly admitted the identification at trial. Appellant's second assignment of error is, therefore, meritless.
In assignment of error three, appellant suggests that the trial court abused its discretion when it denied his motion for a mistrial after the state presented a videotape to the jury of the Londons' residence, which was comprised of close-ups of the victims' adult children and grandchildren, resulting in extreme prejudice. According to appellant, "[t]hese images could have only resulted in an emotional inflammation within the jurors, leading to sympathy for the victims and a desire to convict Appellant regardless of the evidence." (Emphasis added.) We disagree.
It is within the sound discretion of the trial court to grant or deny a motion for mistrial. State v. Sage (1987), 31 Ohio St.3d 173, 182. Pursuant to Evid.R. 403(A), the trial court must exclude relevant evidence if its probative value does not outweigh the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
We are mindful that generally, personal family memorabilia left by the victim is inadmissible during a homicide trial. State v. White (1968),15 Ohio St.2d 146, 151. Even if we assume arguendo that the videotape was prejudicial, it is harmless beyond a reasonable doubt because of the overwhelming evidence of appellant's guilt. While we do not endorse such evidentiary tactics, since this case does not present a combination of errors so egregious as to deny a fair trial, the error indicated was harmless. Furthermore, the trial court providently advised the jury not to be influenced by their emotions:
 "You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence, to decide all the disputed questions of fact, to apply the instructions the Court of the Court to your findings and render your verdicts accordingly. * * *
 "Consider all of the evidence, and make your finding with intelligence, impartiality and without bias, sympathy or prejudice so that both the state of Ohio and the defendant will feel that this case was fairly and impartially tried."[6]
Appellant next submits that the videotape was inadmissible as it was not an accurate representation of the crime scene because the tape was made after Mrs. London's body had been removed, resulting in drag marks and bloody footprints being left behind by the coroner.
In light of the fact that the conditions in the residence had been altered from those that were originally found at the time of the crime, the trial court cautioned the jury prior to playing the videotape:
 "The Court: Ladies and Gentlemen of the Jury, again, I want to restate the fact that this is the scene, the video, after some matters have been or after there had been some disturbance of the scene. So take that into consideration in viewing this."
 "The rule is well settled that photographs and color transparencies are not objectionable so long as they are properly identified, are relevant and competent and are accurate representations of the scene which they purport to portray." (Emphasis added.) State v. Woodards (1966), 6 Ohio St.2d 14, 24-25.
In the present cause, there is no evidence indicating that the videotape was not an accurate depiction of the residence as it appeared on December 23, 1999, when the videotape was made. In fact, Detective Begeot testified as to this point:
 "Q. [direct examination by the prosecutor] And did there come a time that you videotaped the inside as it was at the time that you found the victim?
 "A. Yes. Both inside and outside of the residence during the daylight hours, yes.
 "Q. Now there are some things, for example, that I believe you've testified to and perhaps I know others will that change with a crime scene because you have to go into it; correct?
 "A. That's correct. Any time you enter into it, you're introducing items that may be on your clothing.
 "Q. For example, if Mrs. Donnan went inside, she's gonna open the door and put her hands on the door?
"A. That's correct, sir.
 "Q. These are things that unavoidably happen with crime scenes?
"A. That's correct.
 "Q. And in your photograph you show, once Mrs. London is taken from where she's found, by removing her you're gonna have some drag marks?
"A. That's correct, sir.
"Q Unavoidable to have something?
 "A. Also some foot prints, shoe prints I believe, as well.
 "Q. And I believe the coroner's shoe prints are in there?
"A. That's correct.
"Q. The pathologist; is that correct?
"A. Yes.
 "Q. Now but with that caveat, with that warning, to the best of your ability that scene was preserved and you videotaped it at one point in time; is that correct?
"A. That's correct, sir.
"Q. And you have that videotape with you?
"A. Yes, I do.
"* * *
 "Q. And that video was taken on December 23d I believe?
"A. During the morning, yes.
"Q. And that video shows what existed on the 23d?
"A. That's correct.
 "Q. Some items that we've described and you have taken photographs on the 16th were removed; is that correct?
"A. That's correct.
 "Q. Such as the victim, the teeth of the victim and some items up in the bedroom; is that fair to state?
"A. That's correct.
 "Q. So it's a time thing that the video shows what you saw on that day and the photographs that you've identified that were taken by you or others identify what you saw on the date taken? For example, many of the photographs were taken on December 16th; is that correct?
"A. That's correct, sir." (Emphasis added.)
Thus, the trial court did not abuse its discretion in permitting the jury to view the videotape as there was no evidence tending to show that the videotape was an inaccurate representation of the Londons' residence as it appeared on December 23, 1999.
Finally, appellant seems to suggest that the videotape was inadmissible as it was cumulative due to the number of pictures introduced during trial, and, prior to the commencement of trial, the jury was taken to the Londons' home on May 15, 2000.
In the instant matter, the videotape was not repetitive or cumulative. While the jury toured the Londons' residence on May 15, 2000, the videotape represented the residence as it appeared on December 23, 1999, only eight days after the murders. Furthermore, the photographs, in conjunction with the videotape, presented to the jury a view of the Londons' residence as it appeared days after the murders, which aided their understanding of the evidence and testimony that was presented.
Therefore, based on the aforementioned reasons, the third assignment of error is without merit.
The fourth assignment of error concerns the testimony of Sean Holler ("Mr. Holler") and the failure of the trial court to admit extrinsic evidence indicating that Mr. Holler had been charged with additional criminal offenses in Mahoning County. Appellant urges this court to override the strict application of Evid.R. 609(F), claiming that appellee did not comply with the trial court's order to reveal the convictions at issue. For the reasons that follow, we decline to do so.
By way of background, Mr. Holler testified at trial that on two separate occasions, he had been arrested for domestic violence involving his wife. In rebuttal, defense counsel attempted to introduce exhibits M and N, two certified copies, through the testimony of Morris Louis Hill, Sr., ("Mr. Hill"), a public defender investigator, which illustrated that Mr. Holler had been charged with two additional counts of domestic violence in Mahoning County.
Evid.R. 609 governs the impeachment of a witness by evidence of his or her prior criminal convictions. In particular, Evid.R. 609(F) sets forth the methods of proof that can be used to introduce a prior conviction of a witness for impeachment purposes:
 "When evidence of a witness's conviction of a crime is admissible under this rule, the fact of the conviction may be proved only by the testimony of the witness on direct or cross-examination, or by public record shown to the witness during his or her examination. * * *" (Emphasis added.) See, also, State v. Kamel (1984), 12 Ohio St.3d 306, paragraph two of the syllabus; State v. Lane (Mar. 25, 1994), Ashtabula App. No. 93-A-1782, unreported, 1994 WL 102624, at 2.
Upon consideration, we hold that the trial court did not abuse its discretion in refusing to admit the certified copies of Mr. Holler's remaining charges of domestic violence for two reasons. First, Mr. Holler was not on the stand when defense counsel sought to introduce the extrinsic evidence. As noted above, Evid.R. 609(F) dictates that a prior conviction can be used for impeachment purposes only during the direct or cross-examination of a witness. Rather, defense counsel waited until the state rested its case to seek admission of the certified copies through the testimony of Mr. Hill to impeach Mr. Holler's credibility.
Second, defense exhibits M and N failed to indicate that Mr. Holler wasconvicted of domestic violence. While the exhibits demonstrate that Mr. Holler was charged on two separate occasions with domestic violence, a violation of R.C. 2919.25(A), the exhibits do not clearly indicate if he was ultimately convicted of these offenses. Pursuant to Evid.R. 609(A), only certain prior convictions are admissible. Appellant has failed to satisfy this requirement; therefore, the exhibits were inadmissible under Evid.R. 609(A).
Finally, there is no evidence in the record before this court to indicate that the state intentionally failed to reveal the Mahoning County convictions, or that the state knew of these convictions yet sought to withhold this information from defense counsel. Based on these reasons, appellant's fourth assignment of error is not well-taken.
In the fifth and final assignment of error, appellant asserts that his convictions are against the manifest weight of the evidence.
When reviewing a claim that the judgment was against the manifest weight of the evidence, we must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered. State v. Martin (1983),20 Ohio App.3d 172, 175. See, also, State v. Thompkins (1997),78 Ohio St.3d 380, 387; State v. Ashford (Feb. 16, 2001), Trumbull App. No. 99-T-0015, unreported, 2001 WL 137595, at 9; State v. Schlee (Dec. 23, 1994), Lake App. No. 93-L-082, unreported, at 16, 1994 Ohio App. LEXIS 5862.
In order for an appellate court to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Thompkins
at 387.
"The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175. The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. Thompkins at 390 (Cook, J. concurring).
In the instant matter, appellant does not seem to attack the state's proof on the elements of the crimes. Rather, he challenges the state's proof that he is the perpetrator of the murders, aggravated robbery, aggravated burglary, and kidnapping, claiming that his testimony proves that he did not commit any of these crimes.
Appellant urges that his version of events surrounding the deaths of Mr. and Mrs. London "clearly illustrate that [he] did not participate in any of the acts of which he was convicted." However, matters as to the credibility of witnesses are for the trier of fact to decide. DeHass at paragraph two of the syllabus.
According to appellant, he and Worley initially decided to rob the Londons' house, but later appellant changed his mind:
 "A. [by appellant on direct examination] * * * And me and Mark [Worley] had some discussions. Mark said he wanted to get some money because he needed a place to go. So on the way to church he said he wanted to rob somebody for some money. And so we talked about Dave Hoyle, a couple other people, including the Londons. And we talked about whose house would be the easiest to rob. And we both decided the Londons would be. So that's what we decided we were going to do. * * *
"* * *
 "A. * * * And I told Mark I didn't want to rob the Londons because I knew them and they knew me, and we've got along. We always, we always talked and everything. Whenever I needed help with something they would be there.
 "And so after that he told me he still wanted to. I was like, `All right. But I'm not going to get into it.' * * *"
Nevertheless, appellant admitted at trial to entering the Londons' residence after the murders were committed and removing firearms and the Crown Victoria therefrom. These firearms, including a pellet gun and a bow and arrow, were recovered from the Crown Victoria that appellant was driving.
Appellant further testified that he did not harm the Londons but that Worley, himself, had committed the murders. Appellant claimed that he only helped Worley dispose of Mr. London's body and attempt to move Mrs. London's body because Worley threatened him. DNA from both Mr. and Mrs. London was found on appellant's clothing, and his ball cap was found underneath the body of Mrs. London.
As previously mentioned, Mr. Holler's testimony not only placed appellant at the crime scene but provided a detailed description as to how appellant committed the crimes. According to Mr. Holler, while he was in the county jail, he overheard appellant bragging about how he had murdered two elderly people. Specifically, Mr. Holler stated that appellant described how he murdered the elderly man first, threw him in the trunk of a car and then "went back in * * * after the old lady." Appellant allegedly described twisting the knife in Mrs. London's body so that the wound would not close, and that after he had killed her, he drove to the Mahoning River where he "threw the old man in the river, and that's where he split from his partner."[7]
In fact, during the trial, appellant admitted to placing Mr. London in the trunk, later hurling his body off a bridge into the Mahoning River, and then going to Taco Bell:
 "A. [by appellant on direct examination] * * * And when we [appellant and Mark Worley] got to Youngstown we dropped Mr. London's body off a bridge and then we went to Taco Bell."
Appellant urges that Mr. Holler's testimony "is entirely unreliable as the most dubious of `jailhouse snitch' testimony." In fact, according to appellant's trial testimony, he remembered seeing Mr. Holler in the county jail but denied ever speaking with him about the murders. Despite the conflict in the testimony, we are, again, mindful of the fact that questions of credibility of witnesses are matters left to the trier of fact. DeHass at paragraph two of the syllabus.
Dr. Humphrey Don Germaniek ("Dr. Don Germaniek"), a medical examiner with the Trumbull County Coroner's Officer, indicated that he performed autopsies on Mr. and Mrs. London. Mrs. London suffered thirty-four stab wounds to the chest, abdomen, back, and neck. Further, there was evidence that Mrs. London was restrained by her arms.
Likewise, twenty-eight stab wounds were inflicted on Mr. London's back, arm, chest, neck, and abdomen. Mr. London also suffered six fractured ribs and sustained six gunshot wounds to the face. The six pellets recovered from Mr. London's face were consistent with the BB gun found in the Crown Victoria, which had been driven by appellant. Further, appellant's fingerprints were found on this BB gun, and he admitted to purchasing this gun at a Wal-Mart in Clarion, Pennsylvania.
Dr. Don Germaniek also indicated that some of the stab wounds inflicted on Mr. and Mrs. London had twisting characteristics, which corroborated Mr. Holler's testimony. According to Dr. Don Germaniek, the autopsy protocol was not made available to the media.
After reviewing the record, we cannot conclude that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse the convictions and order a new trial. The previous discussion highlights that the jury had compelling circumstantial evidence placing appellant at the Londons' residence proximate to the time of the murders and demonstrating that he participated in the crimes. In light of this, appellant's convictions are not against the manifest weight of the evidence, and the final assignment of error has no merit.
Based on the foregoing analysis, appellant's five assignments of error are meritless, and the judgment of the trial court is hereby affirmed.
NADER, J., GRENDELL, J., concur.
[1] These charges will be discussed in further detail in the fifth assignment of error.
[2] Detective Begeot testified at the suppression hearing.
[3] R.C. 2923.16 reads as follows:
 "(A) No person shall knowingly discharge a firearm while in or on a motor vehicle.
 "(B) No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle.
 "(C) No person shall knowingly transport or have a firearm in a motor vehicle, unless it is unloaded and is carried in one of the following ways:
"(1) In a closed package, box, or case;
 "(2) In a compartment that can be reached only by leaving the vehicle;
 "(3) In plain sight and secured in a rack or holder made for the purpose;
 "(4) In plain sight with the action open or the weapon stripped, or, if the firearm is of a type on which the action will not stay open or which cannot easily be stripped, in plain sight. * * *" (Emphasis added.)
[4] As an aside, we note that Worley was one of the individuals depicted in the photo array.
[5] Although appellant claims that "[t]he length of time between the day Cattoi saw the person who bought the hot chocolate and the time when she made an identification at the Hubbard Police Station was approximately one week[,]" he is mistaken. The transcript from the suppression hearing indicates that Ms. Cattoi sold two hot chocolates to an individual on December 15, 1999. Then, approximately a month later on January 17, 2000, Ms. Cattoi identified the individual as being appellant.
[6] We note that a jury is presumed to follow the instructions given to it by the trial judge. State v. Jones (2001), 91 Ohio St.3d 335,353.
[7] At trial, Mr. Holler averred that he did not read any of the facts to which he testified to in the newspaper, and that the state did not make any deals with him.